IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MICHAEL SORIANO,

                         Plaintiff,                       Case No. 3:07 CV 1148

      -vs-

                                                     <u>MEMORANDUM  OPINION</u>

STATE FARM FIRE AND
CASUALTY COMPANY,

                         Defendant.

KATZ, J.

      This matter is before the Court on the defendant's motion for summary judgment (Doc. 20).   This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. Background**

      Plaintiff Michael Soriano was owner of a house in Toledo, Ohio insured with a homeowners policy by Defendant State Farm Fire & Casualty Company for damage to the structure and contents. In addition, he had coverage for additional living expenses in the event the insured's home was uninhabitable.

      On or about March 16, 2004, while Plaintiff and his wife, Lisa Soriano, were away from the home, a water pipe broke and caused flooding and extensive damage to their house.  The damage was considered a covered loss under the State Farm policy, and the Sorianos made a timely claim to State Farm.

      Upon receiving the claim, State Farm Representative Tina Simmons contacted Lisa Soriano and, among other things, discussed State Farm's Premier Service Program ("PSP").  PSP can be offered to an insured for a loss such as that sustained by the Sorianos.  The insured may

select from a list of available contractors provided by State Farm or if he or she is unfamiliar with the contractors, State Farm will select the contractor.  The benefit to the insured includes, but is not necessarily limited to, a five-year warranty from the contractor to the insured as opposed to the usual one year that a contractor gives.  Further, the insured does not have to obtain estimates, and payments are made directly to the contractor.

Capricorn Construction was chosen as the Sorianos' contractor.  Defendant believes that the Sorianos chose Capricorn, while Plaintiff alleges it was Defendant that recommended Capricorn through the PSP.  As early as April 4, 2004, Capricorn estimated the repairs would take at least two months, but as time passed, Capricorn continued to extend the anticipated completion date for the restoration.  Capricorn requested draws from State Farm on a periodic basis, and State Farm paid Capricorn the draws it requested.  State Farm made these payments without authorization from the Sorianos.  Over an approximately twenty one month period, Defendant made eight separate payments to Capricorn for work that was not being done properly or at all.  Plaintiff complains that Simmons made these payments on behalf of State Farm without authorization, did not respond to phone calls from the Sorianos, and did not conduct inspections of Capricorn's work, at one point for as long as nine months.  Meanwhile, Capricorn was unresponsive to the Sorianos, telling Plaintiff that Capricorn only answered to State Farm.

During the first two and a half years that the Sorianos were unable to live in their home, they stayed at a Residence Inn, the cost of  which was paid for by State Farm.  The Sorianos requested that payments for the hotel be made to them, rather than directly to the hotel.  Plaintiff testified at deposition that the hotel was smoky, dusty, and sometimes unsanitary, causing him to

develop several health problems, including high blood pressure, weight gain, depression, anxiety, sleeplessness, and eye infections.

State Farm became suspicious of Capricorn's work in October 2005 when Capricorn became non-responsive to communication from State Farm.  In November of 2005, State Farm Claim Team Manager Martin Morrison contacted Mrs. Soriano to advise that he was aware Capricorn had left town. Lisa Soriano requested the name of a non-PSP contractor because she and her husband did not want to stay in the Program.  Morrison gave them the name of Cousino Construction.  Mike Cousino of Cousino Construction inspected the property and met with the City of Toledo Building Inspectors.  Cousino testified that the house was dry, with "piles of junk, dirt, scaffolding, open paint cans, cloths, and cigarette butts all over. . . .  It look[ed] like something was poured on [the grass]. . . . The driveway was cracked [and stained]," the drywall, paint, and carpet were "a mess," and untested gas lines buried in the ceiling were leaking. Cousino Depo. at 76-78.  Cousino learned that not only had Capricorn not acquired the proper building permits necessary to restore the property, but that the City actually placed a stop work order on the house but Capricorn kept operating.  Cousino had to perform a partial tear-out of the work Capricorn did to satisfy the Toledo Building Inspector and to accurately determine the amount of the estimate to restore the Soriano property back to its pre-loss condition.

State Farm agreed to pay for Cousino's initial work in cleaning up Capricorn's mess on a time and material basis.  Cousino's completed estimate for repairs in the amount of $180,573.52 was sent to State Farm no earlier than June 2, 2006.  At the same time, Cousino submitted a bill in the amount of $72,047.41 for the work done to date on a time and materials basis.  Upon receiving the estimates, Claim Team Manager John Chantler (who had replaced Morrison in June, 2006)

requested the services of State Farm Construction Consultant, Jim Vance. The Cousino bill and estimate, combined with what had already been paid to Capricorn, was in excess of the Sorianos' $299,306.04 dwelling policy limits.  The parties negotiated the contract over the next several weeks.  By July 21, 2006, Cousino and State Farm agreed that his estimate of $180,573.52 would be reduced to $172,842.65.  Simmons contacted Mike Cousino after the estimates had been reconciled to confirm that the $172,842.65 estimate was a firm and good number and to confirm that the job would be completed within three months.

Before final payment, however, Chantler approached the Plaintiff and his wife in late August of 2006 with an offer to settle the claims for the restoration of the structure, contents and additional living expenses.  State Farm offered to pay the Sorianos an additional $240,002.75 above what previously had been paid ($584,323.75).  In addition, after receiving assurance that Cousino could complete the work in three months, State Farm made an advance payment of four months of additional living expense.  State Farm did not request nor did the Plaintiff give a release of any claims as a result of accepting this payment on September 8, 2006.

Plaintiff alleges that Defendant then forced him to accept the settlement offer by canceling the Residence Inn payments, forcing the Sorianos' eviction from the hotel.  Defendant states that the settlement offer was to include additional living expense payments which could have covered the hotel, but, because Plaintiff requested the living expenses paid to him rather than directly to the hotel, and he declined to provide a credit card number to the hotel to cover more nights there, the Sorianos were evicted.

Plaintiff has produced an expert witness, Terry Sershion, who is alleged to have twenty-six years' experience in insurance claims management.  Sershion testified that State Farm failed to

4

follow industry standards by issuing extensive payments to Capricorn without the insured's consent; that State Farm should have considered providing better accommodations to the Sorianos; and that State Farm breached its duty of good faith by pressuring the Sorianos to accept a final settlement when they were being evicted from the Residence Inn.

The Sorianos accepted the settlement offer and rented a town house.  On March 16, 2007, Michael Soriano filed the instant action against State Farm, alleging breach of good faith and negligent and/or intentional infliction of emotional distress.  On March 29, 2007, the Sorianos' home passed its final building inspection, and in April 2007, approximately three years after the initial damage, the Sorianos finally moved back into their home.

## II. Standard of review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

5

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams      v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Discussion

Defendant has moved for summary judgment on Plaintiff's claims of bad faith, punitive damages, and intentional and negligent  infliction of emotional distress.

### A. Bad faith

In Ohio, "based on the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (Ohio 1983); *see also Unklesbay v. Fenwick*, 167 Ohio App. 3d 408 (Ohio Ct. App. 2006) ( "the insurer's foot-dragging in the claims-handling and evaluation process could support a bad-faith cause of action"); *Jay v. Massachusetts Casualty Ins. Co.*, 2008-Ohio-846 (Ohio Ct. App. 2008).  In order for an insured to assert a breach of the duty of good faith, the insured and insurer must share a contractual relationship, and the insurer must have acted unfairly in performing or refusing to perform its duty to provide the insured a benefit promised under the policy.  *Gillette v. Estate of Gillette*, 163 Ohio App.3d 426 (Ohio Ct. App. 2005).

Plaintiff alleges that the following actions by Defendant constituted such a breach: State Farm's failure to supervise or inspect Capricorn's work on the property while issuing over $100,000 in payments without Plaintiff's authorization; State Farm's delaying of payments to the insureds and Cousino; and forcing the Sorianos' eviction from Residence Inn.  Defendant counters that its job was to issue payments, not oversee construction; two months is not a bad faith delay, especially during negotiations on payment amounts; and there is no evidence of such eviction, and the insureds were asked to leave the hotel because they refused to tender a credit card number on which to bill future expenses, while Defendant had been paying Plaintiff his living expenses

directly at his request.  State Farm never denied payment to the Plaintiff, and in fact paid tens of

thousands of dollars above the policy limits in realization of the unfortunate situation created by

Capricorn's delay and failure.

Despite the unfortunate circumstances underlying this case, the law is on Defendant's side

here.  The law requires the insurer to handle and pay the claim in good faith; the insurer is not

required to act in the capacity of a general contractor overseeing construction projects before

issuing payments.

> The appellants seem to have expected that their insurer would serve as a sort of
> general contractor whose responsibility it would be to oversee all aspects of the
> renovation of the fire damaged home. This was not the function of State Farm.
> Rather, State Farm merely made payments directly to a contractor chosen by the
> appellants per the appellants' instructions.

*Johnson v. State Farm Ins. Co.*, 1999 Ohio App. LEXIS 6071, at *3 (Ohio Ct. App. 1999); s*ee*

*also Pappas v. State Farm & Fire Cas. Co.*, 2008 U.S. App. LEXIS 6926 (6th Cir. 2008)

("*Pappas* II").  In *Pappas*, the Sixth Circuit affirmed a district court opinion, holding that:

> It seems that plaintiffs [expected] that defendant [State Farm] would function as a
> general contractor.  However, this expectation is baseless.  Defendant's duty under
> the contract was to evaluate the loss and pay plaintiffs an agreed-upon amount.
> Defendant fulfilled its duty when it paid plaintiffs . . . the cost estimated by
> plaintiffs' contractor for the repairs.  As was the case in *Johnson*, here there was no
> refusal to pay the claim, and no contention by plaintiffs that the amount paid was
> unreasonable.

*Pappas v. State Farm Ins. Co.*, Case No. 1:06-CV-00094, Doc. 25 at 12-13 (S.D. Ohio May 1,

2007) (Spiegel, J.) ("*Pappas* I").

The facts in this case are similar to those in *Johnson* and *Pappas*.  It was not State Farm's

obligation to oversee the repairs being done at the property, but rather to handle and pay the claim

in accordance with the insurance policy.  When State Farm did become suspicious of Capricorn, it

did inspect the premises and found the payments to be, essentially, wasted.  Upon so discovering, State Farm did its best to timely secure payment for the new contractor, Cousino, after a two month negotiation period.  Its payments ended up exceeding the policy amount.  State Farm never refused to pay the claim, and Plaintiff does not allege that the amount paid was unreasonable or a violation of the policy.

In *Jay*, supra, the court affirmed liability where the insurer repeatedly denied payment of claims over the course of several years.  *Jay*, 2008-Ohio-846 at ¶89.  In *Unklesbay*, supra, there was bad faith where repeated denials resulted in a three year delay.  In *Ali v. Jefferson Ins. Co.*, 5 Ohio App. 3d 105 (Ohio Ct. App. 1982), there was bad faith where the insurer withheld estimates of damage, refused to settle, and allowed the insured's property to be repossessed.

The facts of this case are notably and significantly less egregious than the facts of those cases where courts have found bad faith.  It is notable that Plaintiff here has not plead breach of contract.  "That is, the complaint does not allege that State Farm failed to comply with the terms of the policy it issued to the appellants in the settlement of the claims. . . ." *Johnson*, supra, at *7. Defendant paid all the claims that were properly presented to it in a timely manner, even exceeding the policy limits in its coverage of the insured.  The only apparent delay was for two months, and during that time State Farm was negotiating with Cousino on the repair costs. Cousino also testified that such delay was normal and expected.  Cousino Depo. at 35-37.  Not only did Defendant settle, but Defendant settled for an amount above the insured policy limit and did so with such promptness that Plaintiff also claims foul on Defendant's eagerness to settle. Plaintiff has not shown with sufficient evidentiary support that Defendant is to blame for the Sorianos' "eviction" from the Residence Inn.  Plaintiff has not shown that he was unable to pay

9

for further hotel stays, even using the money provided by State Farm up to that point or after the settlement.  Plaintiff has not shown why he could not have just given his credit card to the hotel to remain residents there while negotiating the settlement, and then use the advanced or later living expense money to pay that bill.

Finally, the lack of authorization may have been a violation of State Farm's own policy, but that evidence cannot sustain a cause of action for bad faith, where, as here, the insurer handled and paid all claims in a timely manner.  Such failure to authorize falls far short of the actions other courts have found to constitute bad faith.  This action is not one against the insured on the basis of its failure to fulfill its obligations under or abide by the insurance policy or even the PSP.  Rather, it is strictly a tort cause of action against the manner in which the claim was handled.  Variances from the procedures called for in the insurance policy must be considered as a whole in this context rather than as determinative of the insurer's failure to honor its written policy.  The Court herein has no occasion to interpret the insurance policy, as it would in a case alleging violation of the policy.

### B. Punitive damages

Plaintiff's claim for punitive damages is and must be based on a finding of liability for bad faith.  Punitive damages may be recovered against an insurer that breaches its duty of good faith upon proof of actual malice, fraud, or insult on the part of the insurer.  *Staff Builders Inc. v. Armstrong*, 37 Ohio St.3d 298, 304 (Ohio 1988).  "Because summary judgment is proper on both of Plaintiff['s] claims, the Court does not need to reach the issue of punitive damages."  *Pappas* I, supra at 13.

### C. Intentional infliction of emotional distress

10

Generally, the tort of intentional infliction of emotional distress requires a plaintiff to demonstrate extreme and outrageous conduct by the defendant which intentionally or recklessly causes severe emotional distress. *See Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (Ohio 1983). To demonstrate that a jury should hear his intentional infliction of emotional distress claim, Plaintiff must present evidence from which a jury could conclude that the:

> (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious.

*Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 82 (Ohio Ct. App. 1991). For conduct to be found "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965), quoted with approval in *Yeager*, 6 Ohio St.3d at 374-75.

The alleged actions by Defendant in this case fall short of Ohio's standard for intentional infliction of emotional distress. Capricorn's actions as alleged were certainly unfortunate and maybe even egregious, but Capricorn is not a defendant in this case, and, as described above, State Farm cannot be considered responsible for Capricorn's construction deficiencies. Plaintiff certainly suffered the loss of his house for three years, and this Court does not mean to trivialize

11

that loss.  However, Plaintiff's loss was compensated by Defendant by the methods provided for in their agreements (the homeowner policy and the PSP, insofar as they are described above, and represented by both parties).  State Farm paid for the hotel residence, additional living expenses, and the necessary restoration of Plaintiff's home.  Plaintiff does not allege that anything Defendant did was inconsistent with its obligations under the insurance policy or the PSP.  These facts do not show a genuine issue of material fact as to Plaintiff's claim for intentional infliction of emotional distress.  The evidence shows neither that Defendant had the requisite intent, nor that the conduct complained of was sufficiently outrageous.

The same is true with regard to the alleged "eviction" from the Residence Inn.  Plaintiff argues that he was forced to leave the Residence Inn because Defendant stopped living expense payments in an attempt to force him into settlement.  However, Plaintiff does not deny that he requested payments for living expenses be sent to him rather than to the hotel, and that giving a credit card number to the hotel would have extended his stay (which payments would have then been compensated by Defendant via the settlement).  Neither does Plaintiff deny that he never told anyone at State Farm that he did not wish to take the offer and wanted to continue receiving payments.  The settlement offer was enough to cover the construction costs and additional living expenses, and it did not contain a waiver of rights.

### D. Negligent infliction of emotional distress

"A claim of negligent infliction of emotional distress is limited to instances 'where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril.'" *Bunger v. Lawson Co.*, 82 Ohio St.3d 463, 466 (Ohio 1998) (quoting *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 86-87 (Ohio 1995)).  Plaintiff has not briefed the issue, and in any

12

event cannot establish a cause of action with sufficient support to withstand summary judgment. Plaintiff does not allege that he was ever in the "zone of danger" of an accident or dangerous situation which was caused by Defendant State Farm.

**IV. Conclusion**

For the reasons discussed herein, Defendant State Farm's motion for summary judgment is hereby granted (Doc. 20).

IT IS SO ORDERED.

    s/ *David A. Katz*    
DAVID A. KATZ
U. S. DISTRICT JUDGE